# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO. CR-12-0001-001-HE |
| | ) | |
| JULIUS LEE TURRENTINE, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Defendant Julius Turrentine is charged with conspiracy to possess with the intent to distribute 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine powder. He seeks to suppress cocaine and other evidence obtained as a result of a traffic stop and subsequent search of the vehicle he was driving the morning of November 23, 2011. At a hearing on February 29, 2012, the court heard evidence and the arguments of counsel as to the traffic stop and subsequent search. The court concludes the stop and search did not violate the Fourth Amendment and that defendant's motion to suppress should be denied.

### I. Background

On the morning of November 23, 2011, Mr. Turrentine and a passenger, Mr. Johnson, were traveling east-bound on the Turner Turnpike between Oklahoma City and Tulsa in a rented, silver GMC Acadia. OHP Troopers Painter and Owen were on duty that morning and had parked their vehicles side-by-side in the "buffer zone" between the toll lanes and the Pike Pass lanes at the east-bound toll plaza nearest Stroud. Trooper Painter, who was driving

a Dodge Charger, was parked to the east of Trooper Owen, who was driving a Chevrolet Tahoe. Both vehicles were facing south-southwest, angled away from the Pike Pass lanes and turnpike proper.

Trooper Painter testified that at approximately 6:50 a.m. he observed a light-colored SUV fail to use its turn signal when exiting the turnpike proper as it approached the toll plaza from the west. Painter stopped the vehicle, which was driven by Mr. Turrentine, on the east side of the toll plaza after defendant had passed through the plaza. The trooper testified that when he first activated his emergency lights to pull the vehicle over, the passenger sat up, turned around and looked at him, and then laid back down. He further testified that when he approached the vehicle on foot, the passenger acted as if he were asleep. Trooper Painter testified he observed Mr. Johnson, the passenger, breathing heavily and that the pulse in his neck was visible.

Trooper Painter testified that he then advised defendant he had been pulled over for failing to use his turn signal when exiting the turnpike, which defendant denied. Mr. Turrentine produced a Missouri driver's license. Trooper Painter advised the defendant that he would only receive a written warning for the violation, and instructed him to sit in the front seat of the patrol car while he prepared the warning. While in the patrol car, the trooper ran defendant's license through his on-board computer and called it in through dispatch. While waiting for a response, he engaged Mr. Turrentine in conversation about his travel

plans and occupation.[1] According to the trooper's testimony, defendant stated he had been in Las Vegas for the past two days and was on his way home to St. Louis for Thanksgiving. He further stated that he and Mr. Johnson had gambled for 48 hours straight. When asked where they had gambled defendant replied, "All over." When asked where they had slept he replied, "In the car." Defendant added that they stayed "at the Hampton, probably," and then said they had slept in the car at the Hampton. Trooper Painter also inquired about how much money defendant took with him to Las Vegas, and defendant advised that he had not taken much. Trooper Painter testified that he believed defendant became increasingly nervous as this conversation went on, in that he failed to make eye contact, gave abrupt answers, and his heartbeat was visible through his sweatshirt. The trooper further testified defendant's response that he and Mr. Johnson had slept in the car at the Hampton was "strange" and seemed to him to be a fabrication, as was the statement that defendant did not take very much money with him when he was gambling for 48 hours straight.

At some point, Trooper Painter learned the SUV was a rental, and Mr. Turrentine advised that Mr. Johnson rented it and had the rental papers. Trooper Painter then got out of the patrol car and approached Mr. Johnson, who again appeared to be sleeping. Mr. Johnson was asked to produce his driver's license and the rental papers. He had some

---

[1]*The conversation in the patrol car was recorded in full, with both audio and video, by the trooper's on-board camera. Another on-board camera recorded events which occurred in front of the patrol car, such as the conversation with Mr. Johnson and the deployment of Kojak, the drug dog. The exterior camera recorded both audio and video as well, but the conversations between the troopers and Mr. Johnson were difficult to hear. The video and the portions of the conversations which were audible were generally consistent with the troopers' testimony.*

difficulty locating the requested documents, and eventually stepped out of the vehicle in order to find them.  After he found and produced those documents to Trooper Painter, Mr. Johnson stated that they had been visiting Mr. Turrentine's "people" in Oklahoma for the last couple of days.  When asked where in Oklahoma, he replied, "Oklahoma City."  When asked if they had been anywhere else in the last couple of days, Mr. Johnson said, "Nope."  Trooper Painter testified that during this exchange Mr. Johnson's hands were shaking.  Mr. Johnson then re-entered the SUV, and Trooper Painter returned to his patrol car where Mr. Turrentine remained in the passenger seat.

After returning to the patrol car, Trooper Painter asked Mr. Turrentine if Mr. Johnson had won any money in Las Vegas, to which the defendant responded that he did not believe so.  Trooper Painter then asked Mr. Turrentine if they had been anywhere else in the last couple of days, and defendant said they had not.  The trooper then issued Mr. Turrentine a warning and returned to defendant his license, Mr. Johnson's license, and the rental papers. Mr. Turrentine asked Trooper Painter, "Is that it?", to which the trooper replied, "That's it." As defendant opened the car door to get out, Trooper Painter asked him whether he could ask a few more questions, and defendant indicated he was ready to leave and did not want to answer any more questions.  Trooper Painter then advised defendant that he was being detained and instructed him to shut the car door and remain seated.

Trooper Painter advised defendant that he and Mr. Johnson had given inconsistent stories and had been acting nervous and so the trooper was going to have a drug dog come scan the vehicle.  Then, Trooper Painter sent a message to Trooper Owen through his on-

4

board computer indicating that he needed Trooper Owen and his dog to scan the vehicle. Within two minutes, Trooper Owen and his patrol service dog, Kojak, arrived at the scene. Trooper Owen and Kojak are certified as a team by Oklahoma's Council on Law Enforcement Education and Training (CLEET) to detect marijuana, heroin, cocaine, and methamphetamine. After arriving on the scene, Trooper Owen instructed Mr. Johnson, who was still in the SUV, to turn the engine off and roll up the windows.

While Trooper Painter directed traffic away from the scene, Trooper Owen deployed Kojak around the SUV. On the second pass, Kojak gave a "final indication" that it had detected contraband by emphatically scratching at the seam between the driver's side door and front left fender of the SUV. Trooper Owen then informed Trooper Painter and Mr. Turrentine that the dog had indicated the presence of contraband. Trooper Painter did not see the dog give its final indication, but that indication is partially visible on the video recording from his patrol car.[2] The troopers then searched the SUV. They found approximately eleven kilograms of a substance later found to contain cocaine powder in a void between the engine compartment and passenger compartment. Defendant and Mr. Johnson were later searched and placed under arrest.

## II. Discussion

Mr. Turrentine seeks to suppress the evidence obtained by the troopers at the traffic stop, as well as evidence that was later obtained by searching his and Mr. Johnson's cell

---

[2]*The video depicts Kojak standing on his hind legs scratching at the SUV. Trooper Owen explained that this is one of Kojak's "final indications."*

phones pursuant to a warrant supported by evidence obtained at the traffic stop. Defendant seeks suppression on the basis that the traffic stop and subsequent events violated his Fourth Amendment right to be free from unreasonable searches and seizures. He also contends suppression is appropriate on the basis that his Fourteenth Amendment right to equal protection of the laws was violated because Trooper Painter was engaged in racial profiling.

**A. Racial Profiling**

The racial profiling argument is unpersuasive. Defendant identifies no authority suggesting suppression of evidence in a criminal trial is warranted based upon a violation of the Equal Protection Clause, and the court is aware of none. Rather, suppression is an available remedy only for certain violations of the Fourth, Fifth, and Sixth Amendments. Therefore, defendant's argument that he was stopped because he is of African-American decent is relevant here only as it tends to undermine Trooper Painter's credibility as to his testimony that he observed a traffic violation. *See* Whren v. United States, 517 U.S. 806, 813 (1996) (holding that the subjective motivations of the officer "play no role in ordinary [] Fourth Amendment analysis.").

**B. Fourth Amendment**

Defendant advances two arguments as to why his Fourth Amendment rights were violated. First, he contends the stop was not justified at its inception because he did not fail to use his turn signal. Second, he argues that even if the stop was initially justified, Trooper Painter did not have reasonable suspicion sufficient to extend the scope of the stop after he returned the licenses and rental papers. The government has the burden of showing the stop

6

and search were within the bounds of the Fourth Amendment.

A traffic stop is reasonable under the Fourth Amendment if it is justified at its inception and reasonably related in scope to the circumstances which justified it to begin with. United States v. Trestyn, 646 F.3d 732, 742 (10th Cir. 2011). During a valid traffic stop, the officer may obtain an individual's name and check for outstanding warrants. United States v. Burleson, 657 F.3d 1040, 1045 (10th Cir. 2011). A traffic stop may be extended beyond its initial scope if the officer has a reasonable suspicion that other criminal activity is afoot. *Id.* This detention must also be reasonable in duration and scope relative to the suspicions which justified it.

The court concludes the traffic stop was justified at its inception, as the government has established by a preponderance of the evidence that defendant had committed a traffic violation. Failure to use a turn signal while changing lanes in these circumstances is a violation of Oklahoma law. Defendant argues he did not in fact commit such a violation, contending Trooper Painter could not have seen any such violation because Trooper Owen's vehicle blocked his line of sight.[3] He relies on an investigator's testimony as to the probable height of the two patrol vehicles and their positioning. The investigator concluded it would have been "difficult, if not impossible" for Trooper Painter to have seen any lane violation over the hood of Trooper Owen's Chevrolet Tahoe.

---

[3]*To the extent defendant suggests the foggy conditions that morning would have prevented a trooper from seeing a violation, the court concludes otherwise. While the conditions were foggy, the video establishes the conditions were not so foggy as to prevent someone from seeing the presence or absence of a flashing light at the distances involved here.*

While the defendant's evidence might well be sufficient to raise a reasonable doubt as to whether defendant committed the traffic violation, that is not the standard here. For present purposes, the question is whether the government has established by a preponderance of the evidence that the violation occurred, hence justifying the trooper's action. The court concludes it has. Trooper Painter testified that he observed the violation and the court found his testimony to be generally credible. Defendant's suggestion that the trooper's smile shown on the video is inconsistent with observing a traffic violation is speculative and ultimately unpersuasive. The trooper was then conversing with another trooper and there is nothing in the timing or nature of the smile to suggest improper motivation on his part or otherwise reflect adversely on his credibility. Similarly, the court is unpersuaded the evidence as to past lane-change arrests by Painter shows a basis for challenging his credibility.[4] Defendant's investigator's testimony, while providing an arguable basis for the conclusion that the officer couldn't have seen the claimed violation, was necessarily based on assumptions about the distance of the vehicles from the lane change, the position of the patrol vehicles relative to each other, the angle of the patrol vehicles relative to the turnpike, and other factors. The court concludes that evidence is insufficient to outweigh the other evidence showing that a lane change violation occurred and was observed by the officer. Thus, the traffic stop was justified at its inception.

---

[4]*Defendant offered evidence of the percentage of Trooper Painter's lane change arrests over the five months preceding the present stop, suggesting, based on the defendants' surnames, that minorities were disproportionately targeted.*

The court also concludes Trooper Painter had a reasonable basis to extend the detention based on a suspicion of criminal activity. Trooper Painter testified both Mr. Turrentine and Mr. Johnson exhibited signs of nervousness, that both of them gave short, abrupt answers to his questions, and that their explanations concerning their travel plans were contradictory. The defendant attempts to undermine this testimony through a second-by-second analysis of the video depicting the conversation between Trooper Painter and Mr. Turrentine.[5] But the explanations given by the two detainees concerning where they had been over the preceding two days are undisputed and were clearly contradictory. The marked difference in the stories of the two, coupled with Mr. Johnson's efforts to feign sleep, were sufficient to create a reasonable suspicion warranting further investigation.

The extended detention was reasonable in duration and scope. Trooper Owen and Kojak arrived on the scene within two minutes of being called by Trooper Painter. A dog scan such as the one involved here is not a search under the Fourth Amendment, *see* United States v. Kitchell, 653 F.3d 1206, 1221-25 (10th Cir. 2011), *cert. denied*, 132 S. Ct. 435 (2011), and conducting such a scan was reasonably related to Trooper Painter's suspicion that the SUV was carrying contraband. Kojak's final indication on the front left of the vehicle provided probable cause to search the vehicle, and discovery of the drugs provided probable cause to make the arrests.

### III. Conclusion

---

[5]*The video does tend to undermine Trooper Painter's assertion that Mr. Turrentine would not make eye contact with him.*

The traffic stop of the defendant was justified at its inception and the scope and nature of the stop were reasonable under the circumstances. The troopers had reasonable suspicion of criminal activity sufficient to warrant further detention and the deployment of Kojak. The dog alert provided probable cause for the search of the vehicle. Accordingly, defendant's motion to suppress evidence obtained as a result of that search [Doc. #38] is **DENIED**.

**IT IS SO ORDERED**.

Dated this 5th day of March, 2012.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE